Filed 6/30/22  P. v. Williams CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B310320 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. A763191 |
| v. | |
| DARREN CHARLES WILLIAMS, | |
| Defendant and Appellant. | |

APPEALS from orders of the Superior Court of Los Angeles County, William C. Ryan, Judge.  Reversed and remanded with instructions; dismissed as moot.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Amanda V. Lopez and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

Darren Charles Williams appeals from an order denying his petition to vacate his four second degree murder convictions and for resentencing under Penal Code section 1170.95.[1] Reversal is required because the recent legislative amendments to section 1170.95 no longer permit a trial court to rely on an appellate opinion's factual summary to determine a petitioner's eligibility for resentencing. Here, the trial court relied almost exclusively on the California Supreme Court's 1997 opinion in Williams's direct appeal, *People v. Williams* (1997) 16 Cal.4th 635 (*Williams I*). Accordingly, we reverse the order denying Williams's petition and remand for a new evidentiary hearing.

## FACTS AND PROCEDURAL BACKGROUND

### 1.     *The murders, trials, appeals, and habeas petition*[2]

On August 31, 1984, police found Ebora Alexander, age 58, dead in her Los Angeles home from multiple gunshot wounds to the head. Alexander apparently had been shot while sitting

---

[1]     References to statutes are to the Penal Code. On January 12, 2021, Williams filed a notice of appeal from the denial of his petition for resentencing. (B310320.) On February 8, 2021, Williams filed a notice of appeal from the denial of his motion for reconsideration. (B310963.) We ordered the two appeals consolidated under case number B310320.

[2]     We take our procedural history in part from the California Supreme Court's opinion in *Williams I*, as well as from our 2018 opinion in Williams's appeal from a later resentencing, *People v. Williams* (Nov. 29, 2018, B287899) [nonpub. opn.] (*Williams III*). In his opening brief, Williams quotes extensively from the statement of facts in *Williams I*. We take some facts from *Williams I* but recite them not for their truth but only for the basis of Williams's conviction. (See *People v. Woodell* (1998) 17 Cal.4th 448, 459-460.)

at her kitchen table having breakfast. Police also discovered the bodies of Alexander's 24-year-old daughter Dietria and two of Alexander's grandsons, ages 13 and eight. All three had been shot execution style in their beds. (*Williams I*, *supra*, 16 Cal.4th at pp. 647, 649.)

About six months later, detectives arrested Williams in Northern California. After waiving his *Miranda* rights,[3] Williams first told the officers he'd heard about the murders but he hadn't been involved. Later, he admitted he'd been at the Alexander house but claimed he'd run away as soon as the other man who was with him, Tiequon Cox, started shooting. (*Williams I*, *supra*, 16 Cal.4th at pp. 648, 650, 656.) Both Cox and a third man, Horace Burns, were arrested as well. (*Id.* at pp. 647, fn. 1, 648, 650, fn. 3.)[4] Williams told the officers he'd heard that a man named " 'Jack' " from the Vermont Club had paid Cox and Burns something like $60,000 to kill a woman who was suing the club. (*Id.* at p. 656.)

Williams's trial began in mid-September 1986. Williams did not testify, but he presented an alibi defense. (His cousin testified that, at the time of the murders, Williams was asleep on her couch.) (*Williams I*, *supra*, 16 Cal.4th at p. 650.) The jury was instructed on aiding and abetting as well as the natural

---

[3]     *Miranda v. Arizona* (1966) 384 U.S. 436.

[4]     Cox, Burns, and Williams all were tried separately. Cox—"the actual perpetrator of the murders"—was convicted and sentenced to death. (*People v. Cox* (1991) 53 Cal.3d 618.) Burns—who had waited in a van with the getaway driver—was convicted and sentenced to life without parole. (*People v. Burns* (1987) 196 Cal.App.3d 1440.) (*Williams I*, *supra*, 16 Cal.4th at pp. 647, fn. 1, 648, 650, fn. 3.)

and probable consequences doctrine (CALJIC Nos. 3.00, 3.01 (1984 rev.)). The court also instructed the jury on the special circumstance of multiple murder. The court told the jurors, "If the defendant, Darren Williams, was an accomplice or aider and abettor but not the actual killer, it must be proved beyond a reasonable doubt that he intended to aid in the killing of a human being before you are permitted to find the alleged special circumstance of that first degree murder to be true as to the defendant Darren Williams."

In December 1986, the jury convicted Williams on four counts of first degree murder. But the jury failed to reach a verdict on the special circumstance allegation of multiple murder. In 1987 the allegation was tried before a second jury. (*Williams I*, *supra*, 16 Cal.4th at p. 647.) The only witness at the second trial was the court clerk for the judge who presided over the first trial. She testified she was present in the courtroom when the guilt phase jury returned verdicts finding Williams guilty on four counts of first degree murder. (*Id.* at p. 687.) The jury in the second trial found the special circumstance allegation to be true and returned a verdict of death. (*Id.* at pp. 647, 687.)

On appeal to the California Supreme Court, Williams raised a host of issues. The court rejected Williams's claims of instructional error on aiding and abetting and the natural and probable consequences doctrine. (*Williams I*, *supra*, 16 Cal.4th at pp. 673-676.) The court concluded the instructions on murder, intent, and malice—"[c]onsidered together"—"told the jury that an aider and abettor who shares the actual perpetrator's intent to kill must have formed that intent beforehand." (*Id.* at pp. 675-676.)

As for whether an aider and abettor must have knowledge of the perpetrator's unlawful purpose, the court said the instructions advised the jury an aider and abettor must share the perpetrator's intent, and "[i]mplicit in [that] notion" "is knowledge of that intent and harboring the same purpose oneself." (*Williams I*, *supra*, 16 Cal.4th at p. 676.)

The court also rejected Williams's contentions that the evidence was insufficient to show he intended to kill more than one person and he'd formed that intent before going to the Alexander house. The court stated,

> "[Williams] directed [Ida] Moore [who drove the perpetrators to and from the Alexander home] to drive him, Burns, and Cox to 59th Street. Once there, [Williams] tried to locate the house he was looking for by matching its address with one written on a piece of paper he was holding. [Williams] voiced no disagreement when someone in Moore's van mentioned killing everyone in the house. [Williams] told Burns to stay in the van with the women while he and Cox, both armed, went to the house in question. After the killings of the four members of the Alexander family at their home, [Williams] went to the Vermont Club and, shortly thereafter, had a large sum of money. [Williams] told police he had heard that the Vermont Club's owner had a 'contract' out 'to get rid of' a woman who was suing the club, and that the people who collected on that

contract had gone to the wrong house."

(*Williams I, supra,* 16 Cal.4th at pp. 678-679.) The court concluded, "From this evidence, a reasonable trier of fact could conclude that [Williams] had decided to collect on the contract to kill Valarie Taylor, and that on the way to her house he agreed with Cox and Burns that they would kill everyone in the house." (*Id.* at p. 678.)

The Supreme Court did find error, however, in the jury instruction on the special circumstance allegation. Under the law in effect at the time of the 1984 murders, for a defendant tried as an aider and abettor and charged with the special circumstance of multiple murder, the jury had to find that he'd been convicted of more than one offense of murder *and* that he acted with the intent to kill. The court in the second trial instructed the jury the People had to prove only that Williams had been convicted of more than one offense of murder. (*Williams I, supra,* 16 Cal.4th at pp. 687-689.)

The People conceded this error but argued it was harmless, because the jury in the first trial had found intent to kill on Williams's part by convicting him of aiding and abetting four counts of first degree murder. The high court rejected this argument, noting the court had instructed the jury "on an alternative theory of aider and abettor liability, namely, the natural and probable consequences doctrine." The court continued, "A defendant guilty as an aider and abettor under the 'natural and probable consequences' doctrine need not share the perpetrator's intent to kill." (*Williams I, supra,* 16 Cal.4th at p. 691.) Accordingly, the Supreme Court set aside the jury's finding on the special circumstance, reversed the judgment

6

of death, and affirmed the remainder of the judgment. (*Id.* at p. 647.)

On remand, the trial court sentenced Williams to four consecutive terms of 25 years to life. A different panel of this court affirmed the judgment and sentence (*People v. Williams* (Nov. 18, 1999, B120766) [nonpub. opn.] (*Williams II*)), and the Supreme Court denied Williams's petition for review. (*People v. Williams* (Mar. 1, 2000, S084630) [nonpub. opn.].)

In November 2016, Williams filed a petition for a writ of habeas corpus in the superior court, seeking to have his first degree murder convictions set aside based on *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*). (*Williams III.*) There, our Supreme Court held "an aider and abettor may not be convicted of first degree premeditated murder under the natural and probable consequences doctrine." (*Chiu*, at pp. 158-159, italics omitted; see also *id.* at p. 165 [holding the natural and probable consequences doctrine's primary rationale is served, in the context of murder, by holding an aider and abettor "culpable for the perpetrator's commission of the nontarget offense of second degree murder"].)

The trial court issued an order to show cause and the People conceded Williams was entitled to be resentenced to second degree murder under *Chiu*. In January 2018, the court granted Williams's writ petition, reduced his first degree murder convictions to second degree murder, and resentenced him to four consecutive terms of 15 years to life. Williams appealed and we affirmed. (*Williams III.*)

## 2. *Williams's petition for resentencing and the trial court's decision*

On February 14, 2019, Williams filed a document entitled "Petition and Declaration for Resentencing—SB 1437 (Penal

7

Code Section 1170.95)."[5] Williams stated, "As there has been a prior judicial determination that I was not a major participant who acted with reckless indifference to human life [*sic*], and as the accompanying declaration establishes that I meet the applicable criteria, I am entitled to be re-sentenced pursuant to Penal Code § 1170.95(d)(2)."

Williams stated, "[A] jury convicted me of first degree murder as an aider and abettor under the natural and probable consequences doctrine. On direct appeal, the California Supreme Court set aside the special circumstance finding in the case because 'defendant was not the perpetrator of the murders but an aider and abettor.'" Williams attached a declaration in which he stated the information allowed the prosecution "to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine"; he was "convicted of first degree murder pursuant to the felony murder rule and/or the natural and probable consequences doctrine"; and he could not now be convicted because of changes to section 189 as he was not the actual killer, he did not with the intent to kill aid or abet the actual killer, and he was not a major participant who acted with reckless indifference to human life as established by a judicial determination setting aside the special circumstance allegation under section 190.2.

Williams did not ask the court to appoint counsel. Williams attached a copy of *Williams III* as an exhibit.

On March 11, 2019, the prosecution filed two pleadings: a "Constitutional Opposition to Resentencing (Pen. Code,

---

[5] While filed in propria persona, the petition appears to have been prepared by counsel.

§ 1170.95),” and a “People’s Response to Petition for Resentencing (Pen. Code, § 1170.95).” The “People’s Response” conceded Williams had been convicted under the natural and probable consequences doctrine but asserted he was ineligible for relief because (1) he intended to kill; (2) he “was a major participant in the underlying target offense and acted with reckless indifference to human life”; and (3) “[t]he record of conviction prove[d] beyond a reasonable doubt that [he] personally acted with malice aforethought.”

The prosecution contended Williams was “the mastermind and shot-caller in a conspiracy to commit murder.” On the major participant/reckless indifference issue, the prosecution discussed the factors our Supreme Court set forth in *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522 and their application to the facts of this case. But the prosecution never identified the underlying felony Williams committed, during which the victims were killed. The prosecution concluded, “The record of conviction proves beyond a reasonable doubt that the murders were a paid hit organized in advance as part of a conspiracy of which Williams was the leader; that Williams acted with a specific intent to kill; and that Williams acted with malice aforethought.”

On March 14, 2019, even though Williams hadn’t requested counsel, the trial court appointed the Office of the Public Defender to represent him. On April 26, 2019, Williams filed a “Motion to Proceed Pro Se; Reply to the People’s Opposition to Resentencing.” The reply discussed the legislative history of Senate Bill No. 1437 (Senate Bill 1437), asserted the legislation was constitutional, and argued “there exists no evidence as to who actually shot and killed the victim, Maurice Hobbs [*sic*].”

9

On May 1, 2019, the trial court granted Williams's "request to proceed with his petition in *pro se*." On May 24, the court issued a 21-page order rejecting the prosecution's constitutional challenge to Senate Bill 1437. The court also found Williams had made a prima facie showing he was entitled to relief and, accordingly, ordered the prosecution to show cause why Williams's petition should not be granted.

Williams apparently retained Andrew M. Stein and Joseph A. Markus to represent him, and Stein appeared on Williams's behalf at a status conference on July 16, 2019.[6] On February 3, 2020, Markus filed a supplemental reply to the prosecution's opposition. Markus asserted that, because the prosecution had not tried Williams on a felony-murder theory, it could not now raise that as a bar to eligibility. Markus attached as exhibits the prosecution's reply to Williams's habeas petition based on *Chiu*, the *Williams I* opinion, "reporter's transcripts and clerk's transcript,"[7] and Williams's habeas petition.

On February 21, 2020, the prosecution filed a reply to Williams's supplemental reply. The prosecution stated it "did not intend to argue a felony murder theory in this case," adding, "The facts of this case do not appear to support felony murder." The prosecution again asserted the "evidence in the record of conviction" was that Williams "was the architect of a conspiracy

---

[6] The record on appeal does not include either a notice of appearance by the Stein and Markus firm nor a reporter's transcript for the July 16, 2019 date.

[7] As discussed below, the documents Markus attached as Exhibits C and D to his supplemental reply are not part of the record on appeal.

10

to commit murder for hire. An agreement to murder necessarily involves a willful, deliberate and premeditated intent to kill."

On April 27, 2020, Markus filed a reply to the prosecution's reply to Williams's supplemental reply. Markus continued to assert the prosecution—having conceded the application of *Chiu* in the habeas proceeding—was "statutorily and constitutionally barred" from arguing any other "theory of murder liability."

On May 28, 2020, the trial court ordered the parties to schedule a hearing on Williams's petition. The matter was continued twice due to the pandemic.[8] On October 22, 2020, Stein and Markus filed a waiver signed by Williams of his right to appear personally "at all 1437 proceedings" in his case.

Counsel appeared before the court on October 28, 2020. Neither the prosecution nor Williams proposed to call any witnesses or to submit any additional evidence.[9] The prosecutor stated she was "relying on the record in its entirety and that

---

[8] On October 8, 2020, the prosecution filed a second reply to Williams's supplemental reply, citing *People v. Duke* (2020) 55 Cal.App.5th 113, filed September 28, 2020. The California Supreme Court later granted review in *Duke*. (Review granted Jan. 13, 2021, S265309.) On November 23, 2021, the high court transferred the case back to the court of appeal with directions to vacate its decision and reconsider the cause in light of Senate Bill 775. (S265309.)

[9] In its March 2019 response to Williams's petition, the prosecutor stated, "[I]t is . . . the People's intention to present additional firearms evidence at an evidentiary hearing." (Boldface omitted.) This statement seems to be related to the prosecution's reference to evidence it contended showed Williams had fired a revolver inside the Alexander home. The prosecutor said nothing more about this at the October 2020 hearing.

includes the trial transcripts and the trial exhibits." The prosecutor referred specifically to a transcript of Williams's interrogation when he was arrested, marked for identification as People's Exhibit 28B at trial. The prosecutor noted the jury "was instructed on aiding and abetting as one of the theories of liability." She continued, "And the record of conviction in this case proves not only that Mr. Williams was an aider and abettor, but that he acted with the intent to kill and was the mastermind of the conspiracy to commit murder."

The prosecutor told the court the trial transcripts and exhibits "show [Williams] planned and directed the entire chain of events, . . . the entire action from beginning to end." While the jury was not instructed on conspiracy, the prosecutor argued, "The . . . trial transcripts make it clear that a conspiracy existed" —a conspiracy "in advance" "of a paid murder for hire."

Citing *People v. Ramirez* (2019) 41 Cal.App.5th 923 (*Ramirez*),[10] the prosecutor also asserted the court was "bound by" the California Supreme Court's opinion. The prosecutor concluded, "So based upon the trial transcripts and exhibits

---

[10] In that case, an appellate court had granted a habeas petition defendant Ramirez filed after our Supreme Court decided *Banks* and *Clark*. In so doing, the court found insufficient evidence that Ramirez was a major participant in the underlying robbery who acted with a reckless indifference to human life. Ramirez later filed a section 1170.95 petition, which the trial court summarily denied. The court of appeal held this was error: the statute expressly requires a court to vacate a petitioner's murder conviction and resentence him if there was a prior court finding that he was not a major participant who acted with reckless indifference to human life. (*Ramirez, supra*, 41 Cal.App.5th at pp. 926-928, 931-933.)

12

and . . . the California Supreme Court, . . . it's very clear that [Williams] could now be convicted of murder under exist[ing] law on both aiding and abetting and [a] conspiracy theory of murder."

Williams's counsel then argued. His argument is somewhat difficult to understand. On the issue of intent, counsel said, "[T]his jury was hung on the intent to kill by Mr. Williams knowing it was the wrong house." Counsel seemed to contend Williams intended to kill a different victim (presumably, the woman suing the nightclub) but that intent as an aider and abettor "ceased" when "he discovered that the [Alexander] residence was not the residence of the person or the target he sought."

In rebuttal, the prosecutor mentioned transferred intent. (The jury was not instructed on that doctrine.) Citing the Supreme Court's decision in *Williams I*, the prosecutor reiterated, "[T]here was evidence of intent to kill here and . . . there was clearly a conspiracy." In surrebuttal, Williams's counsel told the court the prosecution couldn't rely in a section 1170.95 proceeding on any legal theory they hadn't pursued at trial because Williams "has a right to confront and cross-examine witnesses."

On December 4, 2020, the trial court issued a memorandum of decision denying Williams's petition for resentencing. The court stated, "The People contend that [they are] not limited to theories of liability that were used at the time of trial. Rather, based on currently valid theories of liability, the People argue that [Williams] is guilty of murder because while he may not have been the actual killer, he was the mastermind of the conspiracy to kill the victims or at the very least, directly aided and abetted the killings." The court rejected Williams's

13

contention that "allowing his current second degree murder convictions to stand based on theories of culpability that were not presented to the jury in his underlying trials" would violate his Sixth Amendment rights. Citing cases, the court noted, "petitions under Penal Code section 1170.95 amount to legislative acts of lenity and do not invoke the 6th Amendment right to a jury trial."

The court then stated it was "bound by" "the recitation of facts stated by the California Supreme Court" in *Williams I.* The court concluded, "Based on these facts, the court finds that the People have met their burden beyond a reasonable doubt as to four counts of second degree murder (Penal Code section 189(a)-(b)) whether on conspiracy or direct aiding and abetting theories of liability."

On December 15, 2020, Williams filed a motion for reconsideration. Williams attached the "Special Directive 20-14" issued on December 7, 2020 by the newly-elected district attorney. On January 8, 2021, the prosecution filed an opposition to the motion. On January 12, 2021, the trial court issued a memorandum of decision denying Williams's motion. The court stated the "directive" did "not have the force of law, [did] not amend penal statutes, and [did] not otherwise reopen final judgments." Accordingly, the court said, there was "no basis" to resentence Williams under the directive "absent a specific recommendation from the People pursuant to Penal Code section 1170(d)(1)."

### 3.    *The record on appeal*

On April 8, 2021, court-appointed appellate counsel for Williams sent a letter to the Los Angeles Superior Court appeals clerk noting Exhibits C and D to Williams's February 3, 2020

14

supplemental reply were not included in the clerk's transcript. Counsel noted the supplemental reply referenced the " 'trial record and jury instructions' from trial as 'submitted herewith and marked as exhibits C and D, respectively' "—but the clerk's transcript contained only a cover page titled, "Exhibit 'C' [REPORTER'S TRANSCRIPTS and CLERK'S TRANSCRIPT]," with no document attached, and a cover page titled, "Exhibit 'D,' " that did not include the jury instructions.  Counsel asked that the record be augmented.

On May 3, 2021, the superior court clerk issued a certificate stating, "The Supplemental Reply to People's Opposition to Resentencing Pursuant to Penal Code section 1170.95 was copy [*sic*] exactly as the document is contain [*sic*] within the Superior Court File."

On May 12, 2021, appellate counsel filed a request with this court to augment the record with (1) People's Exhibits 28A and 28B admitted into evidence at Williams's trial, and (2) the reporter's transcripts and clerk's transcripts of the trial— especially the jury instructions—that were attached as Exhibits C and D to Williams's February 2020 reply brief in the trial court. Counsel stated she'd tried to get copies of the transcripts from Williams's trial court counsel (presumably Stein and Markus) but "was advised that [their] copy was lodged with the superior court to ensure they were maintained as the record for purposes of this appeal."

On June 4, 2021, this court ordered the record augmented to include the requested items.  A supplemental clerk's transcript filed on June 28, 2021, contains Exhibit 28B, a 60-page document entitled, "Transcription of tape recorded interview of Darren Charles Williams by David Crews and Fred Miller, Detectives,

15

Los Angeles Police Department."  A clerk's certificate dated June 11, 2021, states, "The people's exhibit #28A is cassette tape and the exhibit #28A is in exhibit storage per Maria Chavez, custodian exhibit.  The exhibit 28B is a transcript to include in the clerk's transcript."

A clerk's certificate dated June 15, 2021, states:

"The reporter and clerk transcript in appeal #B120766, including the jury instructions are not in the dummy file and the imaged documents connect system.  The case is very old.  The appeal in Court of Appeal #B120766 case had issued the remittiture [*sic*] on March 10, 2000 as indicated on court's appeal website.  I have verified the original document for the supplemental reply to people's opposition to resentencing pursuant to P.C. 1170.95 of the Exhibit 'C' (Index 1C 230 pg.) that there are no attachment document to the exhibit.  The supplemental reply to people's opposition (2/3/2020) documents are copied as it is and included in the clerk's transcript."

Another clerk's certificate dated July 13, 2021, states, "The reporter's and clerk's transcripts in appeal no. B120766, including the jury instructions which were lodged with the superior court as Exhibit C are not in the Superior Court file per Justin Crawford, supervisor has verified the documents.  The exhibit 'D' – (CT Index Pages 231-249) were previously included in the original clerk's transcript on January 29,

16

2021.[11] The Supplemental Reply to People's Opposition to Resentencing Pursuant P.C. 1170.95 (2/3/2020), (CT Index Pages 160-249) were previously included in original clerk's transcript and copied exactly as the documents contained within the Superior Court file."

On July 27, 2021, this court issued another order, again ordering the superior court to augment the record with Exhibits C and D to Williams's supplemental reply brief. It does not appear the superior court ever responded to this order. On August 24, 2021, this court granted Williams's counsel's request, in the alternative, to take judicial notice of the reporter's and clerk's transcripts from Williams's trial, filed in B120766, *Williams II*.[12]

## DISCUSSION

### 1. *Section 1170.95*

Senate Bill 1437 took effect on January 1, 2019. (See Stats. 2018, ch. 1015, § 4.) It limited accomplice liability under the felony-murder rule and eliminated the natural and probable

[11] There is no clerk's transcript in this case dated January 29, 2021. The first clerk's transcript was filed March 2, 2021. Page 231 of that clerk's transcript is the cover page for Exhibit D. Pages 232-248 are Williams's habeas petition based on *Chiu*.

[12] At this juncture, more than 22 years after Williams's appeal in B120766, our record consists of 61 volumes of reporter's transcripts and four volumes of clerk's transcripts. The clerk's transcripts contain only some items, such as Williams's motion for a new trial and the California Supreme Court's August 1997 opinion. They do not include the information, minute orders of the proceedings, or the jury instructions.

consequences doctrine as it relates to murder, to ensure a person's sentence is commensurate with his or her individual criminal culpability.  (*People v. Gentile* (2020) 10 Cal.5th 830, 842-843 (*Gentile*); *People v. Lewis* (2021) 11 Cal.5th 952, 957, 971 (*Lewis*).)

Senate Bill 1437 amended the felony-murder rule by adding section 189, subdivision (e).  It provides that a participant in the perpetration of qualifying felonies is liable for felony murder only if the person:  (1) was the actual killer; (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor; or (3) was a major participant in the underlying felony and acted with reckless indifference to human life as described in section 190.2, subdivision (d).  (See *Gentile*, *supra*, 10 Cal.5th at p. 842.)  It amended the natural and probable consequences doctrine by adding subdivision (a)(3) to section 188, which states that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

Senate Bill 1437 also authorized, through new section 1170.95, an individual convicted of felony murder or murder based on the natural and probable consequences doctrine to petition the sentencing court to vacate the conviction and be resentenced on any remaining counts if he could not have been convicted of murder because of Senate Bill 1437's changes to the definition of the crime.  (See *Lewis*, *supra*, 11 Cal.5th at pp. 959-960; *Gentile*, *supra*, 10 Cal.5th at p. 843.)

If the section 1170.95 petition contains all the required information, including a declaration by the petitioner that he was convicted of murder and is eligible for relief (§ 1170.95, subd. (b)(1)(A)), section 1170.95, subdivisions (b)(3) and (c)

18

require the court to appoint counsel to represent the petitioner, if requested; to direct the prosecutor to file a response to the petition and permit the petitioner to file a reply; and to determine if the petitioner has made a prima facie showing that he is entitled to relief. (See *Lewis*, *supra*, 11 Cal.5th at pp. 959-960.) If he has, the trial court must issue an order to show cause, and then must hold a hearing to determine whether to vacate the murder conviction and recall the sentence. (*Id*. at p. 960.)

Senate Bill No. 775 (2021-2022 Reg. Sess.) (Senate Bill 775), effective as of January 1, 2022, amended section 1170.95 in various respects.[13] Senate Bill 775 clarified that the burden of proof at a section 1170.95 hearing is beyond a reasonable doubt and a trial court's finding that there is substantial evidence to support a conviction is insufficient to meet this burden. (§ 1170.95, subd. (d)(3).) The bill also clarified the standards for the admissibility of evidence at the evidentiary hearing. Section 1170.95, subdivision (d)(3) now provides, "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. . . . The prosecutor and the petitioner may also offer

---

[13] Appellate courts in this district and elsewhere have held the new amendments to section 1170.95 apply retroactively to appeals from the denial of petitions not yet final as of January 1, 2022. (*People v. Perez* (2022) 78 Cal.App.5th 192, 204-205 (*Perez*); *People v. Porter* (2022) 73 Cal.App.5th 644, 652; *People v. Montes* (2021) 71 Cal.App.5th 1001, 1006-1007.)

19

new or additional evidence to meet their respective burdens." (§ 1170.95, subd. (d)(3).) The Legislature's specific reference to "the *procedural history of the case* recited in any prior appellate opinion" indicates the Legislature has decided trial judges should not rely on the factual summaries in those decisions when a section 1170.95 petition reaches the stage of a full-fledged evidentiary hearing. (*People v. Clements* (2022) 75 Cal.App.5th 276, 291-292 (*Clements*).)

## 2. *The prosecution is not limited to theories it relied on at trial*

In the trial court proceedings, and again here, Williams asserts the prosecution cannot now rely on either conspiracy to commit murder or direct aiding and abetting as theories that—if proved beyond a reasonable doubt—would render him ineligible for resentencing. Williams is mistaken.

One of the requirements for resentencing is that "[t]he petitioner *could not presently be convicted* of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(3), italics added.) Section 188 defines express and implied malice, and provides, in cases not involving felony murder, "[I]n order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) (Section 189 contains the felony-murder rule. The parties agree this is not a felony-murder case.)

Williams contends we should read the plain language of section 1170.95 "to incorporate principles of estoppel and issue preclusion, for a determination of whether the petitioner could be convicted of murder under a theory that remains viable under

20

current law that is consistent with the prior verdicts and findings in his or her case." We decline Williams's invitation to rewrite the legislation. "The statutes clearly contemplate an opportunity for the prosecution to present new or additional evidence to show that defendants can still be convicted under a valid theory of aiding and abetting." (*Perez*, *supra*, 78 Cal.App.5th at pp. 204-205 [reversing attempted murder counts where jury was instructed on natural and probable consequences doctrine, and "remanding the matter to give the prosecution the opportunity to retry the attempted murder counts"].)

Williams also argues the prosecution—by conceding in the habeas proceeding that he was entitled to be resentenced to second degree murder under *Chiu*—admitted it could not prove beyond a reasonable doubt that he could be convicted of murder under any other viable theory. To permit the prosecution now to prove Williams could presently be convicted of murder on theories of conspiracy or direct aiding and abetting, he says, "violates [his] due process and confrontation rights." Again, Williams is mistaken.

In *Perez*, even though the prosecutor acknowledged at trial that there was insufficient evidence to support a direct aiding and abetting theory, we remanded the case and directed the trial court to allow the prosecutor to retry those counts based on a currently valid theory. We noted, "Where the prosecution makes its case under the law as it stood at trial, double jeopardy is not implicated as it would otherwise be where there is insufficient evidence." (*Perez*, *supra*, 78 Cal.App.5th at p. 205. See also *People v. Hola* (2022) 77 Cal.App.5th 362, 369-377 [reversing murder conviction on direct appeal and remanding matter to the trial court "to afford the prosecution the opportunity to

21

advance a valid murder theory at a new trial"; it is "well settled" that, "[w]hen there has been a postconviction change in the statutory or decisional law that invalidates a theory upon which the conviction was based and reversal is warranted, appellate courts remand the case to the trial court to allow the prosecution to retry the defendant on a legally valid theory"].)

Moreover, the retroactive relief section 1170.95 provides reflects an act of lenity by the Legislature that does not implicate a defendant's rights under double jeopardy rules or the confrontation clause. (See *People v. Hernandez* (2021) 60 Cal.App.5th 94, 111 [evidentiary hearing under section 1170.95 is a resentencing procedure, not a new prosecution; double jeopardy clauses under federal and state constitutions are not implicated]; *People v. Silva* (2021) 72 Cal.App.5th 505, 520 [appellate courts consistently have held section 1170.95 proceedings do not implicate defendants' Sixth Amendment rights]; *People v. James* (2021) 63 Cal.App.5th 604, 610 [same]; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1156 [relief afforded by Senate Bill 1437 "constituted an act of lenity that does not implicate defendants' Sixth Amendment rights"].)

Both direct aiding and abetting and conspiracy to commit murder remain valid theories after the enactment of section 1170.95. (See *People v. Medrano* (2021) 68 Cal.App.5th 177 (*Medrano*).) " 'Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought.' " (*Id.* at p. 183, quoting *Gentile*, supra, 10 Cal.5th at p. 848. See *People v. Estrada* (2022) 77 Cal.App.5th 941 [defendant who acted as aider and abettor with intent to kill is ineligible for resentencing].)

22

As for conspiracy, our colleagues in Division Five recently held section 1170.95 does not "provide[ ] a mechanism for challenging a conviction for conspiracy to murder." (*People v. Whitson* (2022) 79 Cal.App.5th 22, 34 (*Whitson*).) "[C]onspiracy is a specific intent crime requiring an intent to agree or conspire, and a further intent to commit the target crime, here murder, the object of the conspiracy." (*People v. Swain* (1996) 12 Cal.4th 593, 602.) Under California law, conspiracy to commit murder may be based on an agreement to kill " 'a human being' " who is not specifically identified. (*United States v. Wicker* (9th Cir. 2005) 151 Fed.Appx. 563, 565.)

As Justice Moor explained, "The plain language of section 1170.95 does not indicate that it applies to convictions for conspiracy to murder. Conspiracy to murder is not mentioned in the statute. This is particularly significant because the Legislature promulgated Senate Bill 775 in part to amend section 1170.95 to expressly include convictions for attempted murder and manslaughter in the list of crimes subject to petition. Those crimes had not been identified in the original statute. (See Stats. 2020, ch. 551, § 1, subd. (a).)" (*Whitson, supra,* 79 Cal.App.5th at pp. 34-35.) When it added this language, "the Legislature had the opportunity to extend section 1170.95 relief to conspiracy to murder convictions alongside attempted murder and manslaughter convictions, but did not." (*Id.* at p. 35.)

Apart from "the express, unambiguous language of the statute, the omission of convictions for conspiracy to murder is consistent with the Legislature's purpose in enacting Senate Bills 1437 and 775—to ensure, with certain exceptions related to felony murder[,] that 'a conviction for murder requires that

23

a person act with malice aforethought,' and that 'culpability for murder [is] premised upon that person's own actions and subjective mens rea.'  (Stats. 2018, ch. 1015, § 1, subd. (g).)" (*Whitson*, *supra*, 79 Cal.App.5th at p. 35.)  "Both bills left section 187, which defines murder as 'the unlawful killing of a human being, or a fetus, with malice aforethought[,]' unchanged.  (§ 187, subd. (a).)  The legislation also left unchanged section 182, which sets the penalty for conspiracy to commit murder as 'that prescribed for murder in the first degree.' "  (*Ibid*.)  The crime as the Penal Code defines it "is based on the conspirator defendant's own subjective *mens rea*: conspiracy to murder requires that a defendant either act with malice or intend to kill."  (*Ibid*.  See also *Medrano*, *supra*, 68 Cal.App.5th at pp. 182-183.)

3.      ***We must remand the case for a new evidentiary hearing consistent with the amendments to section 1170.95***

At the time of the evidentiary hearing on Williams's petition in October 2020, section 1170.95, subdivision (d)(3) allowed "[t]he prosecutor and the petitioner [to] rely on the record of conviction or offer new or additional evidence to meet their respective burdens" at the evidentiary hearing.  Appellate courts had interpreted this language to mean that an appellate decision was part of the record of conviction admissible in post-trial evidentiary proceedings under section 1170.95.  (See, e.g., *People v. Williams* (2020) 57 Cal.App.5th 652, 661-663 [holding trial court could consider appellate court's fact summaries in an opinion at section 1170.95 hearing because those summaries were "reliable hearsay"].)  However, as we noted, the revised section 1170.95, subdivision (d)(3) permits the court to consider

24

"the procedural history of the case recited in any prior appellate opinion." In including this language in Senate Bill 775, the Legislature omitted any reference to the use of fact summaries and conclusions of fact in subdivision (d)(3). Accordingly, at least one published case has concluded this omission means trial courts no longer should rely on fact summaries from appellate court opinions at the evidentiary stage of a section 1170.95 proceeding. (*Clements, supra,* 75 Cal.App.5th at p. 292.)

Here, the trial court stated it was "bound by" "the recitation of facts stated by the California Supreme Court" in *Williams I.* The court then summarized those facts before concluding, "[b]ased on these facts, the court finds that the People have met their burden beyond a reasonable doubt as to four counts of second degree murder . . . whether on conspiracy or direct aiding and abetting theories of liability."

At the hearing, the prosecutor told the court, "I will be relying on the record in its entirety and that includes the trial transcripts and the trial exhibits, which I've referenced in my motions [*sic*], most particularly 28 . . . ." She continued, "[T]he trial transcripts and exhibits . . . show [Williams] planned and directed the entire chain of events, including telling the driver of the van where to go, telling them where to stop, telling them who to pick up. Directing the entire action from beginning to end." Williams's counsel apparently submitted the trial transcripts (both clerk's transcript and reporter's transcripts) as well as the jury instructions to the court as exhibits to one of its reply briefs. As we have said, those transcripts and instructions are not included in the (quite small) record we received from the superior court in this appeal. We simply

25

cannot determine what portions of the trial record, if any, the trial court considered in denying Williams's petition.

Over the course of about nine court days in November and December 1986, a number of witnesses—prosecution and defense—testified in the guilt phase. Later, over about 11 court days in April and May 1987, more witnesses testified for both the prosecution and the defense in the penalty phase. But, both at the evidentiary hearing and in its written memorandum of decision, the trial court did not cite or refer to any specific testimony at trial, or any exhibit or other evidence. In acting as the factfinder, the court appears to have relied heavily—if not exclusively—on the Supreme Court's factual summary and factual conclusions in Williams's direct appeal. After Senate Bill 775's changes to the statute, this is no longer permissible.

The required remedy is to remand the matter for a new evidentiary hearing. The amended statute expressly authorizes the court to consider "evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony . . . ." (§ 1170.95, subd. (d)(3).) The statute also permits both the prosecution and the petitioner to "offer new or additional evidence to meet their respective burdens." (*Ibid*.)

26

## DISPOSITION

The order denying the section 1170.95 petition is reversed. The case is remanded to the trial court for a new evidentiary hearing consistent with this opinion and the amended statutory provisions. In light of this disposition, Williams's appeal from the denial of his motion for reconsideration is dismissed as moot.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

LAVIN, Acting P. J.

KALRA, J.[*]

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.